1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF NEW JERSEY
2                    Civil No. 2:16-cv-08637-CCC-MF

3
     IJKG, LLC, doing business
4    as CAREPOINT HEALTH -        :    TRANSCRIPT OF PROCEEDINGS
     BAYONNE MEDICAL CENTER,      :           - Motion -
5                                 :
               Plaintiffs,        :
6                                 :
               v.                 :
7                                 :
     UNITED HEALTHCARE SERVICES,  :
8    INC.,  et al,                :
                                  :
9              Defendants.        :
     - - - - - - - - - - - - - - x
10
                              Newark, New Jersey
11                            May 2, 2018

12   B E F O R E:

13                    THE HONORABLE CLAIRE C. CECCHI,
                      UNITED STATES DISTRICT JUDGE
14
     A P P E A R A N C E S:
15
         K&L GATES LLP
16       BY:  GEORGE P. BARBATSULY, ESQ.
              STACEY A. HYMAN, ESQ.
17       Attorneys for Plaintiffs

18       McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
         BY:  GEORGE C. JONES, ESQ.
19          - and -
         DORSEY & WHITNEY, LLP
20       BY:  SHANNON L. BJORKLUND, ESQ.
         Attorneys for Defendants
21
     Pursuant to Section 753 Title 28 United States Code, the
22   following transcript is certified to be an accurate record as
     taken stenographically in the above entitled proceedings.
23
     S/WALTER J. PERELLI
24
     WALTER J. PERELLI, CCR, CRR
25   Official Court Reporter

```
 1              THE DEPUTY CLERK:  All rise.

 2              THE COURT:  Welcome, everyone.

 3              MR. JONES:  Good morning, your Honor.

 4              MR. BARBATSULY:  Good morning.

 5              THE COURT:  Good morning.

 6              We're here on IJKG, LLC v. United Healthcare Services,

 7    Inc., and the Docket Number is 16-8637.  We're here today for

 8    purposes of hearing oral argument on a motion to dismiss.

 9              So let's get your appearances first and then we'll

10    proceed.  Thank you.

11              MR. BARBATSULY:  Good morning, your Honor.  George

12    Barbatsuly from K&L Gates, attorneys for the Plaintiffs.

13              THE COURT:  Good morning.  How are you?

14              MR. BARBATSULY:  Good.  How are you?

15              THE COURT:  Good.

16              MS. HYMAN:  Good morning, your Honor.  Stacey Hyman,

17    K&L Gates, attorneys for Plaintiffs.

18              THE COURT:  Thank you so much.

19              MR. JONES:  George Jones.  McElroy, Deutsch, Mulvaney

20    & Carpenter, for Defendants.  And also with me today is my

21    co-counsel, Shannon Bjorklund, from Dorsey & Whitney.

22              THE COURT:  Thank you so much.

23              Everyone, have a seat.  So we have a motion to dismiss

24    today.  I know that there was some query as to weather the ELMO

25    was working.  Let's talk about what we're going to be using
```

```
 1      before we start and then you'll begin your oral argument.

 2              Does anyone need to hand anything up before we start?

 3              MS. BJORKLUND:  Your Honor, Shannon Bjorklund.

 4              I have a couple of exhibits which are just excerpts of

 5      a couple of the exhibits to the Complaint.

 6              THE COURT:  Okay, great.  You can provide those.

 7      Thank you.

 8              Very well.  At this point, let's begin.  How would you

 9      like to proceed?

10              MS. BJORKLUND:  Thank you, your Honor.

11              Again, my name is Shannon Bjorklund, counsel for

12      Defendants.

13              In this lawsuit there are 11 -- if your Honor is okay?

14      I will proceed with argument.

15              THE COURT:  Definitely.  Go right ahead.  And I've

16      read the papers, so I'm familiar with the case.  So you can go

17      ahead.

18              MS. BJORKLUND:  Thank you.

19              THE COURT:  Thank you.

20              MS. BJORKLUND:  In the lawsuit there are 11 counts

21      that are premised on one core assertion:  That the

22      out-of-network CarePoint Hospitals enforce United Health to pay

23      whatever rates CarePoint chooses to charge.  But neither the

24      Plan terms, nor ERISA, nor state law permits an out-of-network

25      provider to dictate the level of benefits provided in an ERISA
```

```
 1    plan.
 2              THE COURT:  Although, let me stop right there though.
 3              MS. BJORKLUND:  Correct.
 4              THE COURT:  Are they saying that they need a specific
 5    amount or are they asking for the reasonable fees to be paid?
 6              And the way that I see this being alleged is that they
 7    had services that were provided to patients, coverage was
 8    provided by the Defendants and then later some moneys that were
 9    paid were sought back.  Are we in agreement with respect to
10    that?
11              MS. BJORKLUND:  That's correct, your Honor.  So that
12    the primary dispute here is whether Plaintiffs are entitled to
13    more, in addition to the money that they have already received.
14              THE COURT:  Okay.  Let's hold for one moment.
15              Let me hear from the Plaintiff.  How are you
16    determining how much should have been paid versus what was
17    asked to be sort of paid back?  Because Defendants are saying
18    you're setting a very high bar in terms of payment.  But how do
19    you determine what you believe the payment should be?
20              MR. BARBATSULY:  So, we allege on information and
21    belief that all of the Plans require United to reimburse the
22    CarePoint Hospitals for their billed charges, less applicable
23    in-network patient responsibility, and that's for emergent
24    care.  And that --
25              THE COURT:  I'm sorry.  So it's bill charges, less
```

1    applicable?

2          MR. BARBATSULY:  The in-network -- the patient

3    responsibility that a patient -- and this is for emergency

4    care.  So if a patient is going to seek treatment in an

5    emergency room, the patient doesn't have a choice as to whether

6    to -- which hospital to select.  And so when a patient presents

7    at an out-of-network hospital -- typically this is reflected in

8    plans, it's reflected -- and coverage mandates that we cite the

9    complaint in New Jersey -- typically that requirement is that

10   the Plan must make the patient whole, which even if it means

11   paying the provider's bill to charges minus the patient

12   responsibility that the patient would have otherwise had, had

13   they presented to an in-network hospital, such as deductibles,

14   co-payments and co-insurance.

15         We also allege that in the case of elective care, the

16   Plans typically require reimbursement at usual, customary, and

17   reasonable rates.  And we allege at paragraph 90 of our

18   Complaint that our charges are consistent with usual,

19   customary, and reasonable.

20         Now, I recognize United disputes that, but that's an

21   issue that I don't think is before the Court as far as whether

22   our charges are reasonable, customary, and usual.

23         We do have some Plan language that we attached to our

24   Complaint that we think supports our allegations.  Exhibit E is

25   one Plan.  It says, where there is no contracted rate with an

1    out-of-network provider, eligible expenses is determined based

2    on competitive fees in that geographic area;

3         Exhibits L and O -- this is what I was talking about

4    with the emergency mandate -- if the subscriber is entitled to

5    full coverage for an emergency room treatment other than a

6    nominal co-pay, which is waived if the patient is admitted to

7    the hospital within 24 hours, and for elective services, a

8    percentage of the provider's bill charges;

9         Exhibit P, another Plan that we rely on:  Depending on

10   the level of coverage, a $100 co-payment is required, and if

11   the United subscriber is admitted the Plan covers 100 percent

12   of the facility and physician cost to 60 percent of the

13   reasonable, customary charges for the emergency treatment.

14        So, we recognize that Plans vary in terms of coverage,

15   but we allege that in all respects -- and based on the Plans

16   that we've seen and based on information and belief, they have

17   not honored those obligations in part -- and in large part

18   because of their conduct after paying the claims to begin

19   with -- and that's another violation of the Plans, your Honor,

20   which is that they simply offset future claims which we contend

21   in our Complaint is not permitted under the Plans.

22        THE COURT:  Okay.  Let me turn back to the Defendants.

23        Okay.  Go ahead.

24        MS. BJORKLUND:  So, your Honor, what I hear Plaintiff

25   saying is that they are comparing their bill charged to the

1    amount paid, not something like a reasonable and customary

2    rate.  I understand Plaintiffs make one vague assertion in

3    their Complaint that all of their rates are their usual and

4    customary rates, but that simply is insufficient under Twombly

5    to state a plausible claim for relief.

6            I would point your Honor to Footnotes 13 and 14 of our

7    motion.  We also cite Plan terms that describe the varying

8    levels of benefits among the different Plans.  And this is one

9    reason it's very important to look at individual Plans and

10   individual claims to determine whether there is any plausible

11   claim.

12           So, for example, in Exhibit L, the Plan says:

13   (Reading) Our allowed amount is not based on UCR and the

14   non participating provider's actual charge may exceed our

15   allowed amount.

16           That Plan very specifically draws a distinction

17   between "usual and customary" and the Plan's reimbursement

18   rate.

19           Another example would be exhibit -- the excerpts that

20   I provided the Court with Exhibit P.  So if you specifically

21   turn to page 29, this is a Plan that does describe fees in

22   relation to reasonable and customary rates, but again notes

23   that a provider's bill rate may not necessarily be a reasonable

24   and customary rate.

25           Now, Plaintiffs don't make any attempt to give

1          specific factual allegations as to how their rates match up to

2          a reasonable and customary rate.  For example, they don't cite

3          any comparative studies, they don't cite any --

4                    THE COURT:  Although would that be for an SJ as

5          opposed to a motion to dismiss?

6                    MS. BJORKLUND:  So, your Honor, at the pleading stage

7          in an ERISA case, often you have cases, for example, Broad

8          Surgical, where you have to cite specific plan terms to

9          determine that the alleged service is actually provided and is

10         covered under the plan.  And here we have a slightly different

11         question.  But again --

12                   THE COURT:  Here I would imagine both sides agree

13         everything is covered under the Plan.  It's the payment.

14                   MS. BJORKLUND:  I slightly dispute that.  We're

15         talking about the lion's share of disputes which relate to

16         usable and customary rates, but there are also a number of

17         other types of disputes.  For example, incorrect interest

18         payments, billing errors, duplicate submittals.  And in the

19         attachments to the Complaint it indicates that there are a

20         number different reasons for denials.  But I agree with your

21         Honor that the majority, and the ones we're primarily talking

22         about here, the dispute is not coverage, the dispute is whether

23         Plaintiffs are entitled to additional benefits under the Plan

24         over and above what they've already received.

25                   THE COURT:  Okay.  So the dispute is regarding the

1    payment here by and large.  Why isn't it sufficient what

2    they've already alleged?

3            MS. BJORKLUND:  Because, your Honor, they have already

4    been paid.  If you have a situation where a specific type of

5    service is covered under a plan and there's been no payment,

6    that states a plausible claim under ERISA.  But when you have a

7    situation where a claim has already been paid, to state a

8    plausible claim that they're entitled to something more, they

9    have to compare what they've been paid to what is actually

10   dictated under the terms of the Plan.

11           Some of these plans also determine benefits with

12   regard --

13           THE COURT:  Is that something that they have to

14   ultimately prove, or is that something that you're saying they

15   need to allege?

16           MS. BJORKLUND:  Both.  Both, your Honor.  So I think

17   they do need to allege --

18           THE COURT:  Because I think that they've alleged that

19   they're seeking reasonable payment, are they not?

20           Let me hear counsel.

21           MR. BARBATSULY:  We do allege that we're seeking --

22   typically -- we allege that the Plans as written and as some of

23   the language that I cited to your Honor, we allege that the

24   Plans do in the emergency context require our billed charges.

25   But we separately allege that what we -- and with respect to

1    ERISA elective services -- that the Plans require usual,

2    customary, reasonable, and we allege that our charges are

3    usual, customary, and reasonable for purposes of this motion.

4    Your Honor needs to accept that fact as true.  That's an issue

5    that can be explored in the course of discovery.

6            But in many cases, not only -- and I would somewhat

7    disagree with the characterization that this is simply a claim

8    for more.  This is a claim where payments were made and then

9    payments were offset against future claims.  So essentially,

10   for a million dollars worth of our charges they've actually

11   recouped that.  So in many cases we've gotten zero or almost

12   zero payment.

13           So there are several violations that we're relying on:

14           (a) that the result of the offset is that they're

15   drastically underpaying as they're required under the Plan;

16           (b) we contend that they're not even allowed to offset

17   in the way they did.  Because the way the offset language works

18   in the Plans is they have to offset against that Plan, and

19   they're just basically taking money back that is related to

20   future claims that is not derived from this particular claim

21   for benefit.

22           So we have a number of violations that we contend are

23   plausible, one of which, you know, back to your Honor's point,

24   is that we have not been reimbursed as required by the Plans,

25   and that derives in part from the significant offsets that were

1    taken.

2         THE COURT:  Let me ask counsel for the Defendant:  In

3    terms of the offsets, how does that come about?  Why are the

4    claims paid initially and then there's a request for offset?

5         And I realize this is getting a little afield of where

6    we're at.  But just so I understand the background of what your

7    position is on that, if you could explain how the process works

8    in terms of why there is a request thereafter for an offset

9    when claims were initially paid.

10        MS. BJORKLUND:  So, your Honor, I'll describe this in

11    a very high level generally.  It may not be a hundred percent

12    accurate for each of the claims at issue.

13        THE COURT:  That's fine.

14        MS. BJORKLUND:  So, in general, for these emergency

15    room claims, a claim is submitted and payment is issued very

16    quickly.  And in these instances it appears that the payment

17    was for the full billed amount.

18        Now, at a later point in time there was an audit done

19    to determine whether these were actually being appropriately

20    paid, and the audit uncovered a number of issues.  So some were

21    more of the sort of technical administrative issues that I

22    mentioned, like interest calculations or somebody was no longer

23    a Plan participant at the time of the claim, but others related

24    to kind of an assessment of the reasonable and customary rate

25    issue or the actual allowed bills.

1          I would say in counsel's last statement I heard a

2     couple of things that were new that I have not seen in the

3     Complaint, and I just -- they fit into this so I would like to

4     just address them here.

5          THE COURT:  Go right ahead.

6          MS. BJORKLUND:  So one is the allegation that offsets

7     are made against other Plans.  That's nowhere alleged in the

8     Complaint.  I haven't seen any allegation of that, I don't have

9     any specific evidence on that.  And I think that's really not

10    an issue that's before the Court for this motion to dismiss.

11         The other statement that was made is that there is

12    zero or almost zero payment on a number of claims.  And again,

13    I don't think that's something that was pleaded in the

14    Complaint.

15         In the Complaint the allegation is that there was a

16    partial payment, and according to Plaintiffs it should have

17    been higher.  Right?  And that dictates an analysis of the Plan

18    terms.  For example, under a Plan allowing 140 percent of

19    Medicare rates, there's no allegation that their rates match

20    140 percent of Medicare rates, which would justify an increased

21    payment over what has already been done.

22         THE COURT:  If you're measuring it against Medicare

23    rates, why was the claim paid initially at a higher rate?

24         MS. BJORKLUND:  So, your Honor, most of these Plans

25    have multiple different criteria on which they are paid.  So it

1    could be 140 percent of Medicare rates, or an amount as agreed

2    upon with an in-network provider, or there might be a gap

3    methodology.  So it's not always immediately apparent from

4    receiving a claim whether -- you know, which one of those three

5    metrics you would apply.

6            But as far as kind of what the thinking was in the

7    initial claim process, unfortunately I don't know, I can't tell

8    your Honor the answer to that.

9            THE COURT:  So what happens with the patient here?

10   They have their claim paid and then months later or years later

11   they're told that it wasn't paid and they'll have to provide

12   money back?  How does that work?

13           MS. BJORKLUND:  Well, that is where some of the state

14   laws kind of come in and are a bit interesting here.

15           So, there are ERISA plans, and there's preemption for

16   many ERISA plans, and then there could be -- although

17   Plaintiffs haven't alleged the actual existence of -- state law

18   claims.  And so that's where the New Jersey statute saying that

19   patients have the right to be free from balance billing comes

20   in.  But again, that relates to kind of the non ERISA plans

21   that aren't really what we're talking about here.  And I think

22   that really is an issue as between kind of the patient and the

23   provider.

24           I would take slight issue with the fact that there's

25   no choice of which hospital to go to during an emergency.

1    Obviously if you're being picked up from an ambulance you may

2    not have a choice, but patients and people do sometimes

3    exercise a choice in which hospital they choose to seek care

4    from even in the emergent setting.

5         THE COURT:  But generally I think what we're talking

6    about is you're involved in an emergency, you end up at the

7    hospital.

8         MS. BJORKLUND:  Correct.

9         THE COURT:  You're not charting this out for weeks,

10   you're not determining which one to go to.  It's an emergency

11   event, you're in a rush, you're at the hospital.

12        MS. BJORKLUND:  Correct.  And you go, and then at some

13   point you may get a bill for that service just as you would for

14   an urgent care service or a doctor service.

15        I'm thinking of my own personal experience.  I had an

16   incident with my 2-year-old last summer, and I did receive a

17   bill after the fact for emergency room treatment after offsets

18   had been made for insurance adjustments.

19        THE COURT:  What happens then to the patient with the

20   offset thereafter?  So three years down the road after you

21   thought everything was paid, then do you get some request for

22   payment back?

23        MS. BJORKLUND:  So, what happens is the communication

24   comes from United or the provider.  And in this instance I

25   submitted with my declaration one example of an explanation of

1     benefits.  So it would come after the fact in this instance and
2     it would say, you know, we redetermined, and this is the amount
3     of money that is due to you under the plan.  Right?  But the
4     money is paid directly to the provider.
5              And so what happens after that is a matter between the
6     patient and the hospital or the provider.  And so sometimes
7     providers don't bill the additional amount, sometimes providers
8     have an adjustment or have some other rates and some other kind
9     of rate structures that they look at.  But in any event, that's
10    not a question of what is due and owing under the terms of a
11    plan that the patient is a member of where the plan terms are
12    dictated by the contract, which is the coverage.  And what
13    happens as to any rates that exceed that is really an issue
14    between the patient and the provider.
15             THE COURT:  Okay.  Thank you.
16             You can proceed.  I know you have a number of
17    arguments that you would like to make, so go through them.
18             MS. BJORKLUND:  Okay.  So, your Honor, if I could, I
19    would like to turn to exhaustion.  This case is before the
20    Court even though the ERISA appeals process has not yet played
21    out.  Congress mandated a specific appeal process, and in this
22    instance for the four exemplar Plans that have been referenced
23    there's a two-step process.  There are two separate appeals
24    that are done by the Administrator prior to seeking Court
25    intervention as a way to narrow issues, avoid overburdening the

1    Court, streamline it and keep kind of the administrative cost
2    of the Plan well in check.
3            Here, CarePoint is relying on a few lines in a few
4    emails as supposedly satisfying the appeal process for 382
5    separate ERISA claims, and that's very far from the dictated
6    ERISA appeal process.  And I would submit that the pleading in
7    the Complaint makes clear that this process was not actually
8    used and obtained, and so therefore the Complaint should be
9    dismissed.
10           This can happen at a motion to dismiss stage.
11   Sometimes it is at summary judgment.  But when the Complaint
12   makes clear that this process did not occur, a court can
13   dismiss a claim for failure to exhaust, in which case this
14   dispute goes back to the patient, or in this case if there is a
15   valid assignment, the provider and the insurer and the Claims
16   Administrator, and they resolve the appeal process, hopefully
17   narrow or eliminate issues and then it's presented to the court
18   in due course if necessary, or not at all.
19           THE COURT:  Although here when they've alleged that
20   they've received a final adverse decision, why is that not
21   enough to let them proceed on that, especially in light of case
22   law that finds that exhaustion is most often something that's
23   dealt with in this context in a summary judgment context?
24           MS. BJORKLUND:  So, in some cases exhaustion --
25   there's a futility issue and that can be more factual and be

```
 1    resolved later.  I think in this instance they've alleged

 2    certain acts that they contend were exhaustion and then they've

 3    attached that correspondence.  And a bare look at the

 4    correspondence shows that is not even part of the ERISA

 5    process.

 6              I also submitted in my declaration one of the adverse

 7    benefit determinations for a patient which actually postdated

 8    the process.  So as we tried to explain in our brief, there's

 9    the provider dispute process, and then there's a separate ERISA

10    patient process.  So everything that they have attached exists

11    in the context of the provider process and there's simply

12    nothing that even is a part of the ERISA appeal process.  So --

13              THE COURT:  I think they allege futility too, do they

14    not?

15              MS. BJORKLUND:  They do allege futility.  And their

16    argument is interesting.  So there used to be more than 382

17    claims at issue and they disputed some during --

18              THE COURT:  I think you resolved ten of them.  Is that

19    correct?

20              MS. BJORKLUND:  Correct, correct.

21              And so the record demonstrates that communication,

22    even when it's not a full ERISA formal request, has caused

23    United to change its position in certain instances and really

24    reconsider the claims.  And so I would say that demonstrates

25    conclusively that there is no futility in this instance.
```

1           THE COURT:  Okay.  Let me hear from counsel.

2           MS. HYMAN:  Your Honor, good morning.

3           THE COURT:  Good morning.

4           MS. HYMAN:  Yes, we do plead in the Complaint at

5    length and provide examples of the futility in this instance.

6    But counsel for Defendants also forgets that there is a

7    regulation that controls ERISA notice and appeal procedures,

8    and that regulation, 29 CFR 2560.503-1, is triggered when an

9    adverse benefit determination is sent to either the member or

10   the provider.  And under the regulation, an adverse benefit

11   determination is defined as a denial, reduction, or termination

12   of, or a failure to provide or make payment, in whole or part,

13   for a benefit.  And this Court in Premier Health v. United

14   Health Group has held that all repayment demands constitute an

15   adverse benefit determination.

16           So that then triggers ERISA requirements that would

17   require Defendants to send specific information to the

18   provider.  And under Section (g) of the regulation, that would

19   be a specific reason or reasons for the adverse benefit

20   determination that are presented in a manner calculated to be

21   understood by the claimant, and also include a reference to the

22   specific Plan provisions, a description of any additional

23   material information necessary for the claimant to perfect the

24   claim and other requirements as well.  And then on appeal,

25   Section (h) requires certain information be provided, including

1    for group health plans, that they have 180 days to appeal.

2           And we had attached and pleaded with specificity

3    really specific examples, such as for Patient 1 in Exhibits G,

4    H and I, we pleaded that in response to an overpayment demand

5    for $341,000 of the $358,000 for emergent care, they sought a

6    recoupment of that amount, and an email was sent to appeal

7    that.  They accepted that email as an appeal and responded that

8    the appeal -- the decision was upheld.  And then there was a

9    letter attached to that which was an appeals resolution letter

10   dated 9/30/2015 that stated:  (Reading) We find the overpayment

11   refund request remains valid.  The details of our decision are

12   explained on the attached list.

13          Then they say as the reason, they state:  "The

14   executive decision to pay the claim was made at the MNRP

15   rates."

16          In that letter they provide no explanation of the

17   basis for what their executive decision was, what the MNRP rate

18   is; there's no citation to a plan provision permitting that

19   decision; there's no citation to any internal policy or

20   protocol; and no time frame to appeal further.  All it says is:

21   "Your prompt attention to this matter is greatly appreciated.

22   If a response is not received, Oxford Health Plans may offset

23   future payments by the refund amount requested."

24          We then appealed again.  And on 10/27/2015, Exhibit I,

25   again they upheld the appeal decision and they provide the

1    exact same explanation and no further explanation except for
2    that:  "If CarePoint Hospitals seek to arbitrate, they may seek
3    so within 90 days."
4           So again, this demonstrates the futility of any
5    further appeals.  They received two appeals that state the same
6    exact information, and it demonstrates their failure to comply
7    with the regulations.  And these were exemplar claims that we
8    explained in the Complaint.
9           And as far as the futility argument made by counsel
10   that the ten claims were later withdrawn after the appeals
11   process, in the first instance initial letters were sent to the
12   hospital that the hospital never received.  They suddenly were
13   receiving final determination letters and called and asked for
14   information and for the letters to be sent.  They sent a
15   spreadsheet and they asked if they could have more information
16   soon after seeing the spreadsheets, which I believe were sent
17   on October 6th.
18          On October 12 an email was sent by Plaintiffs' counsel
19   requesting additional time to research the claims and for more
20   information.  They were told this would not stop the
21   recoupments, and they recouped a million dollars worth of
22   claims.
23          So whether or not ten were later withdrawn just shows
24   their inconsistent application in the appeals process, because
25   423 claims were not in their asking for $2 million in total --

 1            THE COURT:  Okay.  Thank you.

 2            And I'm back to this in terms of the Defendants:  If

 3    we're talking about futility and we're talking about

 4    exhaustion, against that backdrop how is that something we

 5    would be dealing with on a motion to dismiss?  There is a wide

 6    array of cases that have pronouncements about reserving until

 7    the summary judgment stage on that issue.  Why shouldn't we

 8    have a further development here?

 9            MS. BJORKLUND:  So, your Honor, in sum instances I

10    certainly agree that summary judgment is the more appropriate

11    place for certain questions of exhaustion.  But I would point

12    the Court to the American Chiropractic Association case, and

13    specifically I believe it's Footnote 5, we cited it in our

14    brief, and that footnote notes that when the pleadings and the

15    documents incorporated by reference into the complaint make

16    clear that there has not been exhaustion, it can properly be

17    resolved at a motion to dismiss.

18            THE COURT:  Although they're arguing it's exhaustion.

19    She's just gone through the details --

20            MS. BJORKLUND:  Right.

21            THE COURT:  -- of why she believes it to be

22    exhaustion.  They have alleged and presented materials

23    regarding exhaustion, so then I'm not sure how we fall within

24    the motion to dismiss rubric.

25            MS. BJORKLUND:  Your Honor, I would say part of this

 1    is more of a legal question.  I think counsel's reference to an

 2    arbitration or an ability to seek arbitration is really

 3    telling.  That indicates that this is part of the provider

 4    communication process in which a provider and United may enter

 5    into arbitration to resolve the agreement amongst themselves,

 6    the contract -- the relationship amongst themselves, but it's

 7    separate from the relationship between United and the patient.

 8            And so I would submit that they can't point to

 9    communications that are really entirely separate from the ERISA

10    congressionally-mandated appeal process to plead that

11    exhaustion has occurred.  I would also note the Plan terms have

12    specific rules for what type of information has to go into an

13    appeal of an adverse claim determination.  And to give one

14    example, I believe, your Honor, it's Exhibit L, and on page --

15    it's ECF page 89, it talks about the appeal process.

16            Your Honor, I'm sorry, I have the wrong page.

17            But I do know that that and other plans dictate

18    certain things that need to be part of the appeal.  For

19    example, patient name, date of service, specific information,

20    and any factual information that the patient wants to submit in

21    order to jump the claim.

22            THE COURT:  Isn't that something that can be developed

23    through discovery?  They've already alleged it, and they have

24    in their pleadings contentions regarding utility and

25    exhaustion.  And if we're talking about factual scenarios with

1    the patients and so on, isn't that something we're going to get

2    to in discovery?  And I don't know what's going to happen at

3    that stage, but isn't that more appropriate given what we have

4    here before us?

5         MS. BJORKLUND:  So, your Honor, I make two points on

6    that.  First of all, the exhaustion requirement would really be

7    meaningless if it was always pushed to summary judgment.  The

8    purpose of it is to prevent --

9         THE COURT:  It sounds like we would actually have to

10   parse through this complicated background in order to actually

11   come to some sort of conclusion as to what has occurred.  I

12   mean, they've alleged exhaustion.

13        Let me hear from the Plaintiffs on this, please.

14        MS. HYMAN:  Yes, your Honor.

15        Exhaustion is an affirmative defense.  And just

16   because Defendants' counsel argues in their brief that there is

17   an appeals process that is not an ERISA appeals process doesn't

18   make it so.  The cases that deal with this focus on function

19   and not form.  And their argument that there was an arbitration

20   offer in one of the letters does not make it compliant with

21   ERISA.  They do not comply with ERISA requirements after

22   providing an adverse benefit determination.

23        And in their brief they argue that there was no

24   adverse benefit determination letter even sent because the

25   letters did not contain equivocal language.  And the case they

1    cite to in support of that argument does not even deal with a

2    recoupment demand but is a partial denial of a claim.  And they

3    also cite to our cases in our opposition and say that they

4    didn't deal with the specific type of communication that would

5    be an adverse benefit determination.  But again, all of those

6    cases dealt with the function over form of the type of benefit

7    that was being recouped and decided that it was -- the demand

8    itself was an adverse benefit determination.

9         So once that adverse benefit determination is sent to

10   the provider or the member, that triggers these requirement

11   under ERISA that Defendants just failed to comply with.  And

12   therefore, based on the exception in Section (f) of the

13   regulation, that should be sufficient enough for Plaintiffs to

14   be excused from the exhaustion requirement at this stage.

15        THE COURT:  Although I do note on page 33 of your

16   pleading you do have a section, that "CarePoint Hospitals

17   exhaust available appeals remedies."  Correct?

18        MS. HYMAN:  Well, we exhaust them as much as we could.

19        THE COURT:  Meaning even though it's a defense, you

20   have actually gone through exhaustion?

21        MS. HYMAN:  We have attempted to do so.  And in the

22   argument that we sent an email for one of these claims for a

23   substantial amount of money that Patient 1's claim, that was

24   accepted as an appeal.  And so when we asked for additional

25   time after they failed to send us the initial letters and we

1    pled that they could not prove that they sent them in the first

2    place, they refused and almost immediately started recouping

3    funds.  So, you know, we then tried to appeal them.  And in

4    many instances we received these appeal resolution letters that

5    basically stated "We uphold the decision," and provided no

6    additional information.  Again, no appeals information, no, you

7    have 180 days to appeal.

8            Frankly, the attachment to the motion, Exhibit 1, was

9    sent in March of 2016, months after the second denial for

10   Patient 1 with an October 27th, and it states that the patient

11   is now responsible for the full $360,000 and it says:  "Your

12   Plan paid negative $341,359 because it already recouped that

13   money wrongfully."

14           And the fact is, that this cannot cure their failure

15   to comply with the regulation in the first instance.

16           THE COURT:  Okay.  Thank you.

17           MS. BJORKLUND:  Your Honor, I would like to point out

18   that in this instance United was providing more than the

19   required number of appeals.  So first, United engaged in a

20   provider process beginning with CarePoint during its audit

21   investigation.  I believe one of the communications says:

22   "Please provide us your input otherwise our audit results will

23   become final."

24           And then once that audit investigation and provider

25   communication was complete, there was an AOB issued to the

1    patient.

2          So again, we have portions of communications that

3    related to a relationship between a provider and United, and

4    then other communications regarding an ERISA-mandated appeal

5    process that relates to United and the patient, and what the

6    AOB that was submitted with the declaration attached to our

7    motion contains.  And so it makes sense that that was later,

8    that that was after the communications with the CarePoint

9    Hospital because United actually engaged in two rounds of

10   communication.

11         And CarePoint can't simply avoid -- if it's going to

12   stand in the shoes of the patients, CarePoint can't avoid the

13   ERISA-mandated appeal process in order to resolve any claims

14   that can be resolved before presenting them to a court.  And

15   the fact that United gave them addition opportunities to

16   provide input doesn't eliminate the ERISA requirement.

17         THE COURT:  Okay.  Any response to that?

18         MS. HYMAN:  Whether or not they provided us with

19   additional appeals processes is irrelevant because they came

20   back time and time again with the exact same reason for denial

21   which didn't provide any information that would have provided

22   any meaningful review process for Plaintiffs.  Saying the same

23   thing three times for one patient is not going to provide any

24   more information for us to understand why this benefit wasn't

25   paid at the emergent level when this patient presented to the

```
 1    emergency room.  And the Affordable Care Act requires that the
 2    highest of three rates which would be the reasonable and
 3    customary or what the Plan pays, the in-network or the Medicare
 4    rate would have been paid, and then they recouped nearly 95
 5    percent of that claim.  So their explanation wouldn't have
 6    provided that.  That's a perfect example of the futility of any
 7    efforts made at that point to continue on with any further
 8    appeals.
 9              THE COURT:  Okay.  Anything else on the futility
10    exhaustion?  Otherwise I would like to focus on standing for a
11    little bit.
12              MS. BJORKLUND:  Your Honor, we can proceed to
13    standing.
14              THE COURT:  Excellent.
15              MS. BJORKLUND:  By standing I assume you mean the
16    assignment --
17              THE COURT:  Standing of the assignment, yes, and
18    anti-assignment, waiver, all of those arguments.
19              MS. BJORKLUND:  Okay.  I'll start unpacking the --
20              THE COURT:  Okay.  Thank you.
21              MS. BJORKLUND:  Your Honor, I think the high level
22    point to keep in mind with this whole assignment question is
23    that when a patient assigns a right, the patient no longer
24    holds that right anymore.  And so it's important to read
25    assignments very carefully and very narrowly with the view of
```

1    protecting the patient's right and the patient's ability to

2    bring a lawsuit or a legal claim, especially when there's an

3    ambiguity.

4          So here there is, we contend, an ambiguity in the

5    assignments in that they assigned certain rights, they purport

6    to assign certain rights, but then they also state that the

7    provider is acting as an authorized representative.  Now, by

8    definition, an authorized representative is representing the

9    patient who still holds the claim.

10         And I think this is particularly important with

11   respect to the ancillary ERISA claims, the (a)(2) and (a)(3)

12   claims which are Counts 2 and 3, and also the state law claims.

13   And I think one thing to kind of keep in mind is:  Does this

14   assignment unambiguously give up a patient's right to sue

15   United for breach of fiduciary duty?

16         That is the type of claim that's not easily cordoned

17   off or split.  So a claim for benefits, you may go to the

18   doctor for emergent gallbladder surgery, to use an example from

19   the Complaint.  That's one discrete claim for benefits and you

20   could understand assignment of that to a provider.  But an

21   (a)(2) or an (a)(3) claim is broader relief that applies not

22   only to that claim for benefits but to all other claims for

23   benefits for that particular patient and all other Plan

24   members.

25         And so, in the course of reading whether an assignment

1    is ambiguous or not, the context is very important as to:  What

2    right is the patient giving away?  Is the patient giving away a

3    right to a New Jersey Consumer Fraud Act case for any claims

4    related to the CarePoint Hospitals?  Is the patient intending

5    to give away its right to sue United for a breach of fiduciary

6    duty and obtain certain relief on behalf of the Plan?

7            So that's kind of the first step of ambiguity.  And we

8    contend that the assignment is ambiguous and so therefore

9    shouldn't be construed.  And I will acknowledge that the

10   calculus is different as to Count 1, the claim for benefits,

11   than it is as to all the other claims.  We still think we're

12   right, but I do acknowledge that the calculus is different.

13           THE COURT:  Okay.  And if we're looking at intent to

14   assign rights, is that something that should be decided at the

15   motion to dismiss stage?  If you're saying there's no clear

16   intent, is the Court supposed to construe that?

17           MS. BJORKLUND:  No, your Honor.  I'm sorry, I spoke

18   imprecisely.  I think it's a legal question by looking at the

19   face of the assignment itself, and the legal question is:  Does

20   it unambiguously assign a right?

21           And the point I'm making is that these agreements do

22   not unambiguously assign a patient's right to sue for (a)(2) or

23   (a)(3) breach of fiduciary duty, other breach of duties under

24   the Plan, or the various state law causes of action.

25           Unless there are questions on that, I'll move on to --

```
 1          THE COURT:  No.  I'm thinking ahead in terms of, I
 2   know you have a twofold argument with respect to the
 3   assignment, whether certain rights were withheld and whether
 4   certain rights were actually given, and you're saying there's a
 5   conflict between the two in terms of being an authorized
 6   representative and purportedly assigning rights.  And I know
 7   you rely on a case in your papers, I believe it's MHA, LLC.
 8          Do you have anything else besides that case to support
 9   your position?  And I know you're advocating that case -- I'm
10   not sure exactly how that applies at this point -- but is there
11   anything further that you would like to advance on that?
12          MS. BJORKLUND:  Well, let me provide more context,
13   your Honor.
14          So, there are a number of cases, and I'm taking one of
15   them, a number in New Jersey in the Third Circuit, that make
16   the point the once a right is assigned it no longer belongs to
17   the patient.  There are also a number of cases saying that when
18   there's an ambiguity, the right remains with the patient, or
19   the person.
20          I agree with you, the MHA case doesn't address this
21   precise argument.  In fact, I'm unaware of any case that
22   specifically addresses this precise argument and, yet, I think
23   the underlying contractual interpretation principles are clear.
24          THE COURT:  Let's hear from the Plaintiffs on this.
25          MR. BARBATSULY:  Your Honor, I think the starting
```

```
 1    point on this is the North Jersey Brain and Spine case from the
 2    Third Circuit from 2015, and I think that really did
 3    significantly change the viability of the argument that we just
 4    heard from defense counsel.  You know, North Jersey Brain and
 5    Spine made it clear, reaffirmed that benefits under an ERISA
 6    plan are assignable.  Reaffirmed Congress' intent that ERISA
 7    protect the interest of participants and that, you know, this
 8    is a policy decision of the Third Circuit.
 9            Assignment of ERISA claims to providers, according to
10    North Jersey Brain and Spine, serves the interest of patients
11    by increasing their access to healthcare.
12            So I think the take-away from North Jersey Brain and
13    Spine is that we're going to do away with these real form over
14    substance arguments.  And very clearly the court held:  An
15    assignment of the right of payment is sufficient to confer
16    standing to sue for payment under ERISA 502(a)(1).  That is the
17    denial of payment claim that I think I'm hearing counsel is now
18    conceding -- our assignment does do that.
19            But our assignment does go much broader.  And I think
20    she's -- counsel is suggesting that while it may be good enough
21    for the benefit claim under 502(a)(1), you know, it shouldn't
22    be good enough for the fiduciary duty claims.  And here's where
23    I respectfully disagree.  The assignment here goes broader than
24    what North Jersey Brain and Spine found sufficient, and it
25    covers all rights, benefits, privileges, protections, claims,
```

1    causes of action, interests or recovery arising out of any

2    plan.

3              And North Jersey Brain and Spine did overrule

4    Meadowlands, the MHA case that was relied on heavily by defense

5    counsel.  There, the court had distinguished between -- made

6    really what I would respectfully call a form over substance

7    distinction.  The court had held that assignment of a right to

8    payment and an assignment of plan benefits are two different

9    things, and that only an assignment of plan benefits was

10   sufficient.  North Jersey Brain and Spine did away with that

11   distinction and made it clear that, like I said, an assignment

12   of the right to payment is alone sufficient.

13             Ours does that and much more.

14             With respect to the claim that we have an

15   inconsistency in the assignments, I again have to disagree.

16   The Authorized Representative section simply designates the

17   CarePoint Hospital as an authorized representative relating to

18   all subscriber's rights, benefits, privileges arising under the

19   Plan.  That does not in any way undercut the assignment in the

20   first instance of the subscriber's rights to his or her -- all

21   of her rights, benefits, privileges and protections arising

22   under the Plan.  And I would note that in North Jersey Spine,

23   the language of the Plan that was the issue had language that

24   is now being criticized by counsel in this case.  That

25   language, just as here, had authorized the provider that an

1    appeal to my -- appeal to my insurance company on my behalf, at

2    the same time it also assigned to the healthcare provider

3    payments for medical services rendered to myself or my

4    dependents.  The court didn't cite any inconsistency with those

5    two clauses and upheld the validity of the assignment at least

6    as to the benefits claim.

7            And I think, you know, I have not found any cases

8    either that would support the argument that defense is

9    advocating -- that just because you include an authorized

10   representative section so that it's clear that the person who's

11   taking the action is the hospital -- I have not found any cases

12   that take the position that that somehow extinguishes the

13   assignment the first instance.  I think the argument is

14   foreclosed by North Jersey Brain and Spine.

15           THE COURT:  I'm just curious.  In terms of all the

16   agreements that you have, do you have the authorized

17   representative language in all of your agreements?

18           MR. BARBATSULY:  We have a form that we pled, and the

19   typical form has both clauses in the assignment of benefit

20   form.

21           THE COURT:  Okay.  Thank you.

22           MS. BJORKLUND:  Your Honor, I would like to respond to

23   the New Jersey Spine point.

24           So, first of all, I would point out that the fact that

25   the court didn't independently identify this argument of a

1    conflict between assignment and authorized representative

2    clauses does not do anything for the argument that's presented

3    to this Court.  Some of the facts may have been similar but the

4    argument was never presented and it was never decided, and that

5    case certainly doesn't dictate a result either way.

6         The other thing I would point out about New Jersey

7    Brain and Spine is the language that that opinion makes clear.

8    They're talking about a claim for benefits, a 502(a)(1)(B)

9    ERISA claim.

10        I didn't see anything in the opinion that suggested a

11   breach of fiduciary duty or other type of ERISA claim or a

12   state law claim.  It really was focused on the idea of whether

13   assignment of the right to payment assigned the ability to

14   bring suit to enforce that specific payment, which is obviously

15   very different from our case which has 11 causes of action.

16        The other thing I would point out is, we cited the MHA

17   case for a very basic proposition, which is just when you give

18   up a right, then the patient no longer holds that right.  That

19   continues to be good law.  That was in no way overturned by New

20   Jersey Brain and Spine.  And I am aware of ERISA opinions in

21   this District issued in the last year that have actually cited

22   MHA for a similar proposition, noting that New Jersey Spine

23   abrogated it on other grounds.  So I believe that MHA still is

24   good law for the point that we use it for.

25        And the final point I make on this is just, CarePoint

```
 1     is in charge of its own forms.  CarePoint can choose whether it
 2     wants the claims to be assigned or whether it wants to be an
 3     authorized representative.  But it has to choose, it can't be
 4     both.  Because when it's both it's ambiguous in the terms of
 5     the Plan and then renders it ineffective.  So it's not a
 6     question where they're presented with some terrible issue.  If
 7     they want to be an authorized representative they can draft
 8     their form that way; if they want to be an assignee, they can
 9     draft their form that way, but they can't do both.
10            I'll move on to --
11            THE COURT:  Let's just get a response to that and
12     we'll move on the next issue.  Thank you.
13            MR. BARBATSULY:  Well, you can do both.  And to the
14     extent that there is any arguable conflict, keep in mind that
15     the Authorized Representative section only applies to all of my
16     rights, benefits, and privileges.  And if we're getting really
17     hypertechnical, which I think we can't do under North Jersey
18     Brain and Spine, the way to harmonize those provisions is to
19     the extent that the assignment didn't cover any rights, the
20     authorized -- and I'm not suggesting I adopt this -- but I'm
21     suggesting that to the extent there is a conflict, which I say
22     there isn't, that the assignment controls.  The assignment
23     extinguishes the patient's rights and they belong now to the
24     hospital.
25            So one could read this as sort of a fallback, that to
```

1     the extent there are any residual rights that the patient has

2     that are not extinguished by the assignment, those are the --

3     the hospital is still authorized to proceed.  But there's no

4     inconsistency.

5           And again, coming back to the North Jersey Brain and

6     Spine, that exact authorized rep language or very similar

7     authorized rep language was in that assignment and the court

8     did not even address it, there was no issue.  And there is not

9     a single case that either of us have found that would support

10    the defense's reading of the authorized rep language to somehow

11    extinguish or be inconsistent with the assignment language.

12          THE COURT:  Okay.  Anything?  Last point on that.

13          MS. BJORKLUND:  No.

14          Just to clarify:  I haven't found any case that

15    specifically addresses this argument either way.

16          THE COURT:  Okay.  Fair enough.

17          What's the next position?

18          MS. BJORKLUND:  So, I just wanted to talk about the

19    anti-assignment clauses.

20          THE COURT:  Yes.

21          MS. BJORKLUND:  These apply to Patients 1 and 2 and

22    any other unidentified patients that may be encompassed in this

23    Complaint that have an anti-assignment clause.

24          Our brief cites to the general anti-assignment rule,

25    and the Court's opinion in Cohen v. Independent Blue Cross/Blue

1    Shield, Advanced Orthopedics, and so on -- I'm sorry, that
2    might be -- recognize that an anti-assignment claim can be
3    enforceable in New Jersey as well as in other places.
4          Then because the anti-assignment -- they've now made
5    this counter argument that there's waiver.  I would point out
6    that again we go back to the authorized representative
7    language.  So these forms that the patients allegedly signed
8    have both the assignment and the authorized representative
9    language.  And it's a little bit curious that -- I mean, I
10   suppose the argument would be that United should not have
11   communicated with the hospital even though there was the
12   existence of this authorized representative form.  I would
13   contend that United was acting in accordance with the
14   authorized representative form in having this communication;
15   or, in communicating in CarePoint's capacity as a provider, and
16   that this correspondence in no way waives any anti-assignment
17   right.
18         There's also -- and we cited this in our brief -- one
19   of the Plans has a waiver provision saying waiver of any one
20   provision at one point doesn't lead to waiver of that same
21   provision at a later point or any other waivers of any other
22   piece.
23         One other point I would just make about the Middlesex
24   case.  In their opposition brief, Plaintiffs state that the
25   Middlesex case is not helpful on the point of waiver because it

1    doesn't involve an anti-assignment clause.  And I would contend

2    that that makes Middlesex even stronger for our case.

3    Middlesex addressed whether there was a waiver of an argument

4    that an assignment was not valid even without an

5    anti-assignment clause.  And so if the activity was not a

6    waiver even in the absence of an anti-assignment clause, it's

7    hard to see how it would be a waiver in the presence of a very

8    specific anti-assignment clause.

9              THE COURT:  Okay.

10             Counsel.

11             MR. BARBATSULY:  So, I'll make an argument that at the

12    outset we think, as we said in our brief, that we think the

13    statute that we cite, New Jersey Statutes Annotated

14    26:2S-6.1(c), that alone, we would respectfully submit, renders

15    anti-assignment clauses unenforceable in New Jersey as a matter

16    of law.  I would just respectfully refer your Honor to the

17    Appellate Division case we cited, New Jersey Dental Association

18    v. Horizon Blue Cross/Blue Shield.  And I won't belabor this

19    point, I recognize your Honor and Judge Wolfson have reached a

20    different view of this in the Advanced Orthopedics case, and I

21    believe Kaul v. Horizon, so I won't belabor the point.  I would

22    just respectfully ask that your Honor take a second look at

23    that in light of the policies that are now articulated in the

24    North Jersey Brain and Spine case.  So that's my first

25    argument, the first argument we raised in the brief.

1            But more fundamentally, I guess your Honor doesn't

2    necessarily have to reach the issue of enforceability of

3    anti-assignment clauses as a general matter post-North Jersey

4    Brain and Spine, because as the cases we cite indicate or make

5    clear, that such clauses can be waived by a course of business

6    dealing.

7            Let's back up though for a second.  Because the

8    anti-assignment clauses, there's really only one

9    anti-assignment clause that's at issue and that's the clause in

10   Exhibit L, the Plan that's Exhibit L.  The Plan that's in

11   Exhibit O says essentially, you know, rights can be assigned

12   only with the consent of United.  So I think that's a little

13   different.  And we plead -- and we'll get into course of

14   dealing -- but the course of dealing that we plead we think is

15   sufficient to amount to a waiver across the board.

16           But certainly with respect to Exhibit O, we contend

17   specifically that that particular clause gives the Plan the

18   right to consent, and the Plan did consent through its course

19   of dealing.

20           But more fundamentally, the Premier Health case that

21   we cite, a 2012 Westlaw case, 1135608 (D.N.J. April 24, 2012),

22   the course of dealing that was alleged was very similar to what

23   we have in this case.  It included specifically letters

24   notifying Premier of overpayment.  We have those here.

25   Demanding a refund.  We have those here.  Notifying Premier of

1          the proper procedure to dispute HealthMed's decision.

2                    Well, if we have notices of a procedure, we say that

3          it's not the proper procedure.

4                    Telephone calls between HealthMed and Premier.  We

5          have telephone calls and emails here.

6                    Communications with Premier via email.  We have those

7          here.

8                    And then the court in Premier said:  Such actions

9          impede United or HealthMed's ability to rely on the

10         anti-assignment provisions to challenge Premier's standing.

11                   I can go through at length our Complaint details,

12         exhibit through exhibit, detailing an extensive course of

13         dealing.  Starting with Exhibit A, an email exchange; Exhibit B

14         another email exchange; Exhibit C and D, spreadsheets setting

15         forth recoupment demands, actual recoupments starting some time

16         around November; Exhibit F, audit findings; Exhibit G, another

17         email exchange; Exhibit H, and appeal resolution letter;

18         Exhibit I, another appeal resolution letter.  I can go on and

19         on.  In none of the correspondence is there any implication

20         whatsoever of a bar or a refusal to speak to us based on an

21         anti-assignment clause.

22                   And I recognize your Honor has recently written -- or

23         more recently than a briefing written on this issue in the

24         case, Kayal Orthopaedic Center v. Empire Blue Cross/Blue

25         Shield, 2017 Westlaw 4179813 (D.N.J. September 21, 2017).  In

 1    that opinion, your Honor acknowledged the case law that

 2    addresses course of dealing.  And in that particular case your

 3    Honor said:  (Reading) Plaintiff here fails to allege the sort

 4    of routine and ongoing course of dealing which might otherwise

 5    support an argument for waiver.  Outside of direct payment, the

 6    only conduct which plaintiff asserts demonstrates a course of

 7    dealing was defendant's written response to appeal efforts.

 8            An assertion of waiver based on an isolated

 9    communication is distinct from the level of ongoing engagement

10    at issue in the DeMaria and Gregory Surgical Service cases that

11    your Honor had action acknowledged.

12            And we submit that we have far more than an isolated

13    communication.  We have a whole litany of communications that I

14    just alluded to.

15            So that is a course of dealing that's inconsistent

16    with the enforcement of any anti-assignment clause, even the

17    one in Exhibit L.

18            And I will note, counsel relies on an anti-waiver

19    provision in Exhibit L.  That doesn't say what counsel says it

20    says.  It simply says:  The waiver by any party of any breach

21    of any provision of the Certificate will not be construed as a

22    waiver of any subsequent breach of the same or other provision.

23            That's different from the waiver of a contractual

24    right to an assignment.  There's no allegation of a breach

25    except by us.  But there's nothing in there that says a waiver

```
 1    of -- or direct communication counts as a -- doesn't count as a
 2    waiver.
 3              And even if that did count, your Honor, I would submit
 4    that this whole -- this case law and this extensive course of
 5    dealing does foreclose the argument at this stage for -- for
 6    relying on that alleged anti-assignment clause.  And of course,
 7    like I said, that only applies really to one Plan.  The other
 8    Plan has sort of a carve-out for consent.  Two of the Plans
 9    that we attached to the Complaint don't have any
10    anti-assignment clause, and it remains to be seen in discovery
11    what the other Plans at issue are.  They haven't identified any
12    other anti-assignment clause.
13              So I would submit that at a minimum that issue is not
14    appropriate for resolution here on this motion.  But I think --
15    and we've certainly alleged more than we needed to with respect
16    to course of dealing.
17              THE COURT:  Okay.  Thank you so much.
18              Counsel has indicated that he's provided ample
19    evidence, pointed to ample evidence and has sufficient
20    pleadings with respect to waiver.  And he's not just relying
21    upon direct payment, he has a whole course of dealing including
22    emails and telephone conduct and a litany of things.  How would
23    you respond to that?
24              MS. BJORKLUND:  I would say, your Honor, all of that
25    communication is perfectly consistent with the idea of an
```

1    authorized representative.  It can't be that by communicating
2    with someone who is an authorized representative pursuant to
3    assigning a patient document, an insurer like United is then
4    waiving any anti-assignment clause or any right based on
5    assignment.  So the Authorized Representative portion of that
6    agreement means that United can communicate with the provider,
7    and that's exactly what it did.
8            Even aside from the Authorized Representative portion,
9    United is certainly free to communicate with a provider as to
10   disputes between the two parties.  As to, obviously in-network
11   providers have an independent relationship with an insurer or a
12   claims administrator, but also even out-of-network occasionally
13   there are agreements between those entities, and it's not
14   inconsistent with the terms of a Plan to have communications
15   like that.
16           I would also say that the waiver, to address the point
17   about the waiver provision in Exhibit L, the breach of a
18   provision is the anti-assignment provision.  The
19   anti-assignment provision says you won't assign your claims,
20   and if you do it's not valid.
21           And so by assigning claims, that's the breach.  And so
22   a waiver of any breach isn't a waiver of anything -- any other
23   right to assert that same breach.
24           The other point I would make is that plaintiff now
25   contends that since only some of the Plans at issue have

1     anti-assignment, that the Court shouldn't address it now.  I

2     respectfully disagree.  In my experience, a court can rule on

3     this issue as to certain patients and thereby narrow the

4     issues, and when later Plans sort of come to light if this case

5     were to proceed --

6              THE COURT:  Although we have over 400 patients at

7     issue here.  Are we going to go through each one --

8              MS. BJORKLUND:  We have over 400 patients.  We know

9     423, or whatever the number is, claims.  We don't know the

10    overlap of the patients, we don't know how many Plans are at

11    issue.

12             THE COURT:  But just by the very nature of what you

13    just said, how is the Court going to parse through that now?

14             MS. BJORKLUND:  So the Court would not be able to rule

15    as to a certain number of patients or a certain line item of

16    claims, but it could certainly rule as to the two Plans in

17    front of it and issue a ruling that would make a similar ruling

18    as to any other Plans with similar language.  That would then

19    be presented to the Court on kind of an early motion or some

20    other proceedings as the Court sees fit so that there isn't

21    this wasted expenditure of Court resources to do discovery and

22    can resolve claims that actually shouldn't be in court in the

23    first place.  But I submit that also is an option as to

24    exhaustion.  If the Court were to believe that factual

25    development is necessary, that can proceed without other more

1      rigorous or extensive or time consuming for the Court aspects

2      of the case.

3              THE COURT:  Okay.  Let's hear a response from the

4      plaintiff.

5              MR. BARBATSULY:  So, two things.  As for the

6      allegation that what they were doing in dealing --

7      communicating with us was consistent with an authorized

8      representative versus an assignment, there's no evidence from

9      any of the correspondence that they were relying on solely on

10     an authorized representative versus an assignment.  In fact,

11     there was no discussion of that issue one way or the other.  So

12     to suggest that, well, no, we didn't waive it because we were

13     only looking at the authorized representative form and not the

14     assignment form, that's really not an issue before the Court

15     and not an issue that the Court can decide for purposes of this

16     motion.

17             And that's with respect to -- and with respect to

18     Patient 1, the No Waiver Clause, they interpret it as the

19     assignment is the breach versus a right.

20             Again, those are fact issues.  Those are going to be

21     issues of interpretation of the Plan that are really

22     appropriate for -- not appropriate for a motion-to-dismiss

23     phase.  The settled rule for interpreting ERISA plans is

24     contra proferentem, meaning that you can construe the Plan

25     terms against the drafter of the Plan.

```
 1              And so I don't think on this record it's appropriate,
 2    certainly not with respect to the 423 claims, but not even with
 3    respect to a single claim to make a broad pronouncement as to
 4    the import of these isolated plan provisions without the
 5    benefit of discovery, and particularly in the face of this
 6    extensive record that is attached to the Complaint of dealing
 7    with our clients without so much as a hint of an
 8    anti-assignment clause issue.
 9              THE COURT:  Unless there's anything else on this, I
10    would like to discuss fiduciary duty.
11              MS. BJORKLUND:  Just one minor point.
12              THE COURT:  Yes.
13              MS. BJORKLUNDI:  I would say that actually silence in
14    the record weighs against waiver and not in favor of it.  And
15    general waiver is a voluntary relinquishment of a known right.
16    And continued course of communication is consistent with
17    authorized representative.  And silence on the point of
18    assignment I believe would actually counsel against a waiver
19    argument.
20              THE COURT:  Anything else on that, Mr. Barbatsuly?
21              MR. BARBATSULY:  Well, I just refer back to the
22    extensive record that we have and the case law that makes it
23    clear what a course of dealing is that would amount to a
24    waiver.
25              THE COURT:  Okay.  Let's move on.
```

1          Thank you.

2          MS. BJORKLUND:  If I could very briefly address Count

3     2 and failure to state a claim.

4          Our primary argument is that Plaintiff CarePoint has

5     not adequately pleaded that United is a fiduciary under ERISA.

6     There are a number of cases saying that processing claims or

7     being a claims administrator is not sufficient, that it

8     requires some additional exercise of discretion.

9          I would note that by default under ERISA and Plan

10    terms, the Plan administrator is the Plan sponsor.  So it's a

11    little confusing.  There's a Claims Administrator and a Plan

12    Administrator.  And the Claims Administrator processes the

13    claims; the Plan Administrator is in charge of, in a bigger

14    discretionary function as to kind of developing and

15    implementing the Plan itself.

16         And so this breach of fiduciary duty claim goes

17    against the Plan Administrator, whereas really it's the

18    documents and the record and ERISA's underlying presumption

19    indicating that United is not the Plan Administrator, it would

20    be the Plan Sponsor, meaning like an employer in most

21    instances.  This is an issue that's appropriate to be resolved

22    on a motion to dismiss.  I point you to a case cited in our

23    brief.  See the Ambulatory Surgical Center of New Jersey v.

24    Horizon Healthcare case.  It's 2008 U.S. District Lexis 13370.

25    And I'll leave it at that.

1              THE COURT:  Okay.  Anything on this?

2              MR. BARBATSULY:  So, as far as the precise role that

3      United now claims it stands in, we cited a number of cases,

4      including Chao v. New Jersey Licensed Beverage that make clear

5      that fiduciary status is a fact-intensive inquiry making

6      resolution of that issue inappropriate for a motion to dismiss.

7              And our claim in Count 2 is a claim for appropriate

8      equitable relief under the relevant section of ERISA that would

9      be available to redress a fiduciary duty breached.  And the

10     lead case, the case that we cite on that is a Third Circuit

11     case, Hahnemann University Hospital v. Allshore, Inc., 514 F.3d

12     300 (Third Circuit 2008).  The court upheld and, in fact,

13     upheld in the context of an assignment that the reviewing of

14     the record supported a finding that the defendant had breached

15     a fiduciary duty that it had owed to the plaintiff as an

16     assignee of the patient.

17             So the claim is clearly permitted.  And whether United

18     is a fiduciary or not by virtue of it's very varied roles is

19     really not something that this Court should decide on this

20     record.  A fiduciary though, again the case law is, it's a

21     function not a form determination.  And so we contend

22     functionally United did act as a fiduciary in making all the

23     discretionary decisions, including the decisions ultimately to

24     recoup substantial sums of money from our client.

25             THE COURT:  Okay.  Thank you.

1          How does the Defendant respond in terms of, first

2     let's address whether a healthcare provider can pursue a

3     fiduciary duty claim and address it in the context of the case

4     law which appears to allow those claims to go forward?

5          MS. BJORKLUND:  So, I guess this goes somewhat back to

6     the assignment issue.  Right?  So if there is a valid

7     assignment of a patient's right for an (a)(2) breach of

8     fiduciary duty claim, then since the provider is holding that

9     right it would seem that the provider can assert the right of

10    the patient if the provider in fact holds that right.  Now,

11    that's different than saying a provider can assert its own

12    breach of fiduciary claim for a breach of fiduciary owed to it.

13    It would be in the context of a duty owed to the patient, not

14    to the provider.

15         Going back to the issue of whether fiduciary duty

16    status can be resolved on a motion to dismiss, again I would

17    direct your Honor to the Ambulatory Surgical Center case.  I

18    think that really touches on this precise issue and ruled that

19    it was appropriate on a motion to dismiss.  But to say as to

20    who is the plan, there are two ways that I can think of that

21    they can adequately plead this, but they haven't done either.

22    So they haven't adequately pleaded that United is a plan

23    sponsor.  Even if there is a vague assertion in the Complaint,

24    it's contradicted by the underlying documents and by the

25    statute ERISA itself.

1          And then the second point is, the cases note that you

2     can plead specific facts to establish a fiduciary duty, but a

3     fiduciary duty is a question of law.  You can't simply plead

4     that there is one, you have to plead specific concrete facts

5     under Twombly that would allow the Court to see that there is,

6     in fact, this duty, and that is simply lacking from the

7     Complaint.

8          THE COURT:  Thank you.

9          Anyone?

10         MR. BARBATSULY:  I'll just say that we don't have to

11    plead that they were a plan sponsor, we just have to plead that

12    they were a fiduciary.  And any party that has any

13    discretionary role in a claim's decision is a fiduciary.  So

14    it's not, again, not a form issue, it's a functional issue.

15         MS. BJORKLUND:  Can I just clarify one point?

16         THE COURT:  Certainly.

17         MS. BJORKLUND:  Fiduciary duty status is a legal

18    question.  It's a legal conclusion and needs to be pleaded with

19    specific facts.  One way to plead that fact is by trying to

20    allege a plan administrator, and that was my point in that

21    instance.  But other than that there are no other pleaded facts

22    to support a legal conclusion of fiduciary duty.

23         THE COURT:  Okay.  Although I will point out that

24    there are several cases, for example, Neurosurgical Associates

25    of New Jersey PC v. QualCare, for example, this is a quote:

1    ERISA fiduciary status is highly fact-based dependent upon

2    tests performed by the individual or entity.  Thus, rulings on

3    this issue have tended to occur after discovery rather than at

4    the pre-discovery motion to dismiss stage, closed quote.  And

5    there are other cases which echo the same sentiments.

6           MS. BJORKLUND:  So, your Honor, I would acknowledge

7    that the cases take different positions.  I mean, I do think

8    Ambulatory Surgical, not to be a broken record, is the most

9    precisely-on-point case and does resolve on a motion to

10   dismiss.  I think two are two issues.  First, one is pleaded.

11   Because as Twombly says, we can't plead a legal conclusion, you

12   have to have specific concrete facts to back it up.  And then

13   the second is:  Is there enough of a factual dispute, a factual

14   dispute about whether these actions occurred or they rise to

15   the level of fiduciary status.  And that I think is what the

16   cases that you referenced are really more talking about.  But

17   this Complaint is devoid of specific allegations that would

18   give rise to a fiduciary duty status.

19          THE COURT:  Okay.  Anything else on this before we

20   move forward with the next point?

21          MR. BARBATSULY:  No, your Honor.

22          THE COURT:  Thank you.  All right.  What do we have

23   next?

24          MS. BJORKLUND:  Your Honor, I will move on to the

25   state law claims unless there's anything else you would like to

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1    address.

2              THE COURT:  That's fine.

3              MS. BJORKLUND:  So, from the face of the Complaint it

4    appears that CarePoint concedes that Counts 4 through 6 are

5    preempted.

6              THE COURT:  Actually before we do the state court

7    claims, let me ask Plaintiffs:  I think they're pled in the

8    alternative.  Correct?

9              MR. BARBATSULY:  That's correct.  So we did make a

10   point in our brief that we're not pleading the state law claims

11   to the extent that they are directed to any ERISA plans.

12             THE COURT:  Are you asking this Court then to construe

13   those claims, or only in the event you are not successful on

14   the federal claims?

15             MR. BARBATSULY:  Well, at this point we've pled that

16   we have a number of claims.  The Plans that we've attached to

17   the Complaint appear to be self-funded ERISA plans, so

18   obviously those would be ERISA claims for which our state law

19   claims would not be actionable.  But we have requested and have

20   not gotten, and we would hope to get in discovery, all of the

21   Plans.  So really the state law claims would arise to the

22   extent you have a Plan, for example, an individual insurance

23   policy that's not governed by ERISA, not an employee benefit

24   plan, that would be governed by state law.

25             THE COURT:  Let's go back to just the very basic

1      question.  In terms of the Plans, do you have and are you

2      alleging non ERISA plans for those state court claims?

3              MR. BARBATSULY:  We have not seen plans that are

4      covered -- that are not covered by ERISA, but we have

5      identified 423 claims in the Complaint that are at issue.

6      United is in control of the information as to whether those are

7      ERISA plans or not ERISA plans.  United hasn't come forward

8      obviously at this stage.  I'm not suggesting that they had to,

9      but that issue has not been fleshed out in discovery.  But we

10     would be pleading these claims to the extent that those -- any

11     of those 423 claims are individual policies of insurance that

12     are not governed --

13             THE COURT:  How do you suggest at this point, if we're

14     uncertain as to whether they are non ERISA plans at play, how

15     would the Court deal with this issue from the Plaintiffs'

16     perspective.

17             MR. BARBATSULY:  From the Plaintiffs' perspective,

18     what I would suggest is, as part of the I guess the initial

19     disclosure process, assuming obviously that we can get past the

20     motion on the ERISA claims which we believe we should, that as

21     part of the initial disclosure process, that United be directed

22     to produce every single plan that governs every one of the

23     claims in our case.  At that point both parties are going to be

24     more informed as to, if to the extent that your Honor does --

25     and I recognize, I don't want to push the burden on the Court

1      with hypothetical claims that may not ultimately --

2              THE COURT:  That's what I'm getting at.  If we're not

3      really dealing with non ERISA claims, do we really need to

4      address those state claims at this point?

5              MR. BARBATSULY:  From the Plaintiffs' perspective, we

6      would be amenable to deferring that decision pending discovery

7      of the full Plans.  I mean, our argument is that these are all

8      ERISA plans, and so to the extent that United says, not so

9      fast, you don't have an ERISA claim with 50 of these plans

10     because they're state law claims, we have those claims in the

11     alternative.

12             THE COURT:  Okay.  Let me ask counsel:  Are there any

13     Plans here at issue that are non ERISA?  And how should we deal

14     with this issue of the unknown at this point?

15             MS. BJORKLUND:  Your Honor, I don't have an answer on

16     whether there are any non ERISA plans potentially at issue.  I

17     point out that this whole colloquy illustrates the divide

18     between CarePoint, the Plaintiff in this case, and the patients

19     whose rights they are supposedly vindicating.  But the patients

20     do have copies of their own Plans, they have to be provided

21     every year under ERISA, and yet CarePoint doesn't have those.

22             So we would submit, Defendants would submit that those

23     claims should be dismissed at this time.  It's not sufficient

24     to simply plead a cause of action when you think you might come

25     up with facts that might support that cause of action.  You

1       have to have concrete facts at the time of a motion to dismiss.

2               Now, the federal rules also allow for amendment of

3       pleadings in certain circumstances when appropriate, and I

4       think that would be a much more appropriate venue than allowing

5       claims to proceed when Plaintiffs acknowledge that they are not

6       aware of the existence of any non ERISA plans.

7               THE COURT:  Okay.  In terms of this, I'm thinking if

8       we did go down a path such as that and permitted an amendment,

9       normally you'd amend within a certain period of time.  I'm not

10      certain how much time you would need to determine -- I'm going

11      to ask the Plaintiffs -- to determine whether you have non

12      ERISA plans.

13              MR. BARBATSULY:  Well, I think that depends on United

14      since -- I mean, counsel has made an extra record fact that the

15      patients have all the Plans.

16              We've alleged in the Complaint -- and that's what we

17      have in front of the Court -- that we have a handful of Plans

18      that were produced in pre-suit discussions.  We don't have all

19      of them, and we think that those should be provided and then we

20      can discuss a schedule for that and then a schedule for -- to

21      the extent we -- I don't agree dismissal of the state law

22      claims is warranted at this point because we do have the right

23      under Rule 8 to plead in the alternative, and that's what we've

24      done.

25              But to the extent --

```
 1              THE COURT:  But in terms of pleading to the
 2    alternative, is it pled that you have non ERISA plans?
 3              MR. BARBATSULY:  No.  It's pled that to the extent
 4    that any of the Plans covering these 423 patients are not ERISA
 5    plans, then they are governed by state law.  So that's the
 6    alternative theory.  But that's a fact, that's not -- at this
 7    point as between the parties in this case, only United has
 8    those facts at this point.
 9              So we've pled --
10              THE COURT:  Although they're saying, well, you should
11    be able to get them through the patients.
12              Should you be able to get those through the patients?
13              MR. BARBATSULY:  Well, we don't necessarily have --
14    well, logistically whether each patient would cooperate, we're
15    dealing with claims that are now eight, nine years old, that's
16    an issue.  But we should as assignees of the patients' rights
17    under the Plans, we should be able to get them from United.
18    And those are documents that ought to be, and in our experience
19    in these cases, are provided in discovery.
20              And so to the extent that there's any decision to
21    defer, I would submit that the decision would be premised on
22    United providing the Plans and then having the parties
23    reviewing those Plans and assessing which -- the extent to
24    which any are non ERISA plans at that point.
25              THE COURT:  And let's go back to this:  If they are
```

1    all ERISA plans, then do you submit that those state court

2    claims would not go forward?

3              MR. BARBATSULY:  If they're all ERISA plans, then --

4    well, I shouldn't say categorically.  But I think with the

5    particular causes of action that we've pled, that they would

6    not be -- they would not go forward because they would be

7    preempted by ERISA.  ERISA does have a carveout for state

8    statutes, you know, governing the insurance company insurance

9    industry.  We haven't pled at this point any claims arising

10   under any specific state statute.

11             So I would submit that -- I would agree with your

12   Honor that to the extent that there are no non ERISA Plans --

13   which I think is highly unlikely, by the way, because just

14   given the number of claims -- but to the extent that there are

15   none, then we would not be pursuing state law claims.

16             THE COURT:  And as far as the earmarks of a non ERISA

17   plan, what would it be, governmental or some other plan?

18             MR. BARBATSULY:  Yes.  Any plan that would not follow

19   the definition of an employee benefit plan under the ERISA

20   statute.  So that would include a government plan, it would

21   include an individual policy of insurance, that's saying an

22   individual who doesn't have insurance through his or her

23   employer, you know, got off of the exchange, for instance.  And

24   there are plans of that nature as well and we have just don't

25   know the extent to which that's gone on here yet.

1               THE COURT:  Okay.  Let's get a response.

2               MS. BJORKLUND:  So, your Honor, I think this narrows

3       the issues significantly if there is a confession that the

4       state law claims don't go forward unless there is existence of

5       a non ERISA plan.  I mean, I would agree with counsel's

6       assertions.

7               Do you want me to go into specific alternate reasons

8       for dismissal?  Or if there is something you would like me to

9       discuss --

10              THE COURT:  If there's anything else you feel you

11      would like to amplify beyond what's in your papers, you may do

12      so.  Go ahead.

13              MS. BJORKLUND:  Thank you, your Honor.

14              So there are seven state law claims, and I won't

15      torture all of us by going through every single one of them.

16              THE COURT:  As I said, I read the papers.  So if you

17      would like to go through the highlights, that would be fine.

18              MS. BJORKLUND:  Right, exactly.

19              So one point I would like to make is, Count 8, the

20      promissory estoppel claim, which is supposedly based on a

21      promise made during an unidentified, undated phone call with no

22      quotations.  And this is based on paragraph 162 of the

23      Complaint.  The allegation and a supposed promise made by

24      United is that certain claims are covered under the Plan.  And

25      as we've discussed many times, there's an issue of coverage and

1      then there's an issue of extent of coverage.  And this case

2      really focuses on extent of coverage.

3              So an assertion that a particular type of claim or

4      type of benefit or type of medical service is covered under a

5      plan is very different than a dispute as to whether the amount

6      paid by United complies with the terms of the plan in

7      comparison to the amount that Plaintiffs are charging.  So

8      that's all on Count 8.

9              THE COURT:  Anything on that?

10             MR. BARBATSULY:  So, with respect to Count 8, and we

11     do allege that there is a clear and definite promise in the

12     sense of course of paying claims dating back to 2010.  The

13     allegation that we haven't relied on the claims because, number

14     one, for emergency we have no choice but we have to treat the

15     patients who come to our doors in emergency situations.

16     Obviously that rationale doesn't apply with elective patients.

17     But the other more fundamental issue, because of this extensive

18     delay and the paid claims dating back many years and now

19     claiming years later we did it wrong, you owe us hundreds of

20     thousands of dollars, we're not in a position -- or we're in a

21     much worse position by this conduct based on the fact of this

22     delay and this now sort of pulling the rug out from under us.

23     So that we think is the essence of a promissory estoppel claim.

24             And I do want to kind of qualify one thing I said

25     earlier.  We don't -- we're not pursuing these state law claims

 1     to the extent that they are governed by ERISA plans.  But I
 2     will say the Broad Street case that we cited and that defense
 3     counsel cited, that was a case where the court found no
 4     standing based on an ERISA plan but found a -- recognized the
 5     existence of a promissory estoppel claim based on an
 6     independent promise to pay.  And so to the extent that the
 7     defense is going to argue that we somehow lack standing for a
 8     particular claim even if it was an ERISA plan, we would want to
 9     have a full-back argument based on the Broad Street case that
10     we had a promise notwithstanding the extent that we didn't have
11     standing.
12          So that would be my only sort of qualification to what
13     I said earlier.  That even if there is an ERISA plan in play
14     but defense argues and is ultimately successful in arguing that
15     we don't state a claim under the plan, we would have this
16     fall-back promissory estoppel claim per the Broad Street case.
17          THE COURT:  Okay.  Anything on that?
18          MS. BJORKLUND:  So, your Honor, I just point out --
19     and I apologize if I'm misunderstanding what he's saying -- but
20     for a promissory estoppel claim, I mean there could certainly
21     be a preemption issue to the extent the promissory estoppel
22     claim is dictating the level of insurance benefits under an
23     ERISA plan, and I think that would still exist.  But otherwise
24     I understand his point, but he's basing it on other
25     communications outside of the plan.  But again, I would submit

1       there is a preemption issue.

2               THE COURT:  Before we go any further, tell me which

3       ones are the state court claims if you would like to read off

4       the numbers.

5               MS. BJORKLUND:  4 through 11.

6               THE COURT:  4 through 11.  Okay.

7               MR. BARBATSULY:  Just for clarification, the

8       quantum meruit claim, we didn't substantively oppose the motion

9       as to that particular claim, so we're not -- to the extent that

10      we do go forward with state claims, we are not going to be

11      pursuing that claim.

12              THE COURT:  Okay.  That is number what?

13              MS. BJORKLUND:  7.

14              THE COURT:  Number 7.

15              MR. BARBATSULY:  7.

16              THE COURT:  I don't know if you would like to send in

17      a letter or something to that extent.

18              MR. BARBATSULY:  That's fine, your Honor.

19              THE COURT:  Great.  So that's Number 7 you're not

20      going to be pursuing.

21              What do we have in terms of the injunctive relief,

22      Count 9?

23              MS. BJORKLUND:  So, your Honor, one argument we made

24      in our brief is that there are not any allegations related to

25      irreparable harm or public interest or some of the other

1     factors that are required for injunctive relief.  Also, there
2     remains a preemption issue.  And I would point the Court to the
3     relief sought at the end of the Complaint, which is very broad
4     and applies to -- apparently applies to any claims by the
5     affected patients who assign their rights, or any other
6     patients who didn't assign their rights to CarePoint of those
7     same Plans and of going forward prospectively for any future
8     claims as coming from CarePoint.
9               So again, we think that the standing and the
10    assignment issues are particularly important to that injunctive
11    relief claim because it does have such a broad impact.
12              THE COURT:  Okay.
13              Mr. Barbatsuly.
14              MR. BARBATSULY:  And I'll just point out that the
15    cases we cite, including the McGee v. Continental Tire and as
16    to the declaratory relief claim and the First Choice v. Wendy's
17    case as to the injunctive relief suggest that these are
18    discretionary remedies that are ordinarily not appropriate for
19    resolution at the early stages.  So we have these claims, and
20    there are facts that have to be developed in discovery.
21              In the First Choice case, for example, as to
22    injunctive relief, the plaintiffs asserted that they were
23    seeking injunctive relief as an ancillary remedy and that they
24    do lack an adequate remedy at law.  The court said, at the
25    early stage of the litigation and based on the allegations, the

1    court is not inclined to foreclose the injunctive relief as a

2    possible remedy.

3            I would submit that at this stage your Honor should

4    leave both the declaratory and injunctive relief and defer

5    decision on those until later in the case.

6            THE COURT:  Until later in the case?

7            MR. BARBATSULY:  Yes, until later in the case, your

8    Honor.

9            THE COURT:  Okay.  And in terms of that, are you

10   saying that as part and parcel of just we need not address it

11   at this point because it's the ultimate relief sought?

12           MR. BARBATSULY:  (a) because I think the inclination

13   is to defer decision on the state law claims pending further

14   discovery, we would request discovery as to the Plans; but (b)

15   even assuming that we move forward, those are types of relief

16   that the Court would typically fashion really at the end of the

17   case after all the proofs are in and the Court decides whether

18   it needs any kind of broad declaratory relief to impose to

19   protect the parties' rights or injunctive relief.

20           And, by the way, those types of claims, similar

21   arguments -- we have similar claims in the ERISA context as

22   well, that the declaratory and injunctive relief are available

23   under ERISA.  And so, again, we would submit that that decision

24   as to where to impose broad declaratory, broad injunctive

25   relief is not for now, it's for later in the case after all the

 1    proofs are in.

 2            THE COURT:  I have a question about deferring versus

 3    dismissing without prejudice with a right to replead after

 4    discovery.  Is there any true distinction between those two?

 5            MR. BARBATSULY:  Well, the distinction is that had we

 6    adequately pled state law claims, and if we have, then

 7    dismissal is not appropriate.  If we haven't, then dismissal is

 8    appropriate.

 9            We submit we have adequately pled state law claims

10    because we've identified 423 claims.  We've pled under Rule 8,

11    we've pled in the alternative --

12            THE COURT:  But that's what I'm getting at, in the

13    alternative.  If we don't -- I mean, you say in the

14    alternative, if they're non ERISA plans, here are our state

15    claims.  However, do you have to go through the analysis and

16    then say:  We've identified the following non ERISA plans, and

17    you go through at least something very, very general even to

18    rise to the level of a sufficient pleading?  Do you have to do

19    that, number one?

20            And if you do have to do that, isn't that something

21    that the Court would then be in a position to dismiss without

22    prejudice pending your receipt of the non ERISA plans with an

23    appropriate time period for you to replead on that so that you

24    could state that you actually affirmatively have those Plans?

25            MR. BARBATSULY:  I think we're sort of in a bind

1    because we don't control the information at this stage.  United

2    has the Plans.

3         THE COURT:  But with the Court maybe setting a

4    schedule for the Plans to be provided and thereafter some sort

5    of an amendment.

6         MR. BARBATSULY:  Well, I still think there is a

7    difference between a dismissal even without prejudice and even

8    if your Honor were to give leave to amend after the production.

9    But I think the real question is, on this pleading, have we

10   stated state law causes of action.

11        And I respectfully submit that on this pleading we

12   have, and we've done it in the alternative.  So I would submit

13   that that is an appropriate -- we have pled these appropriately

14   under Rule 8 as alternative claims.

15        I would be amenable, if your Honor were not to reach

16   those issues until it's definitive, but I don't think dismissal

17   is the right way to go because that would imply that we had not

18   properly pled the claims, and I think we have.

19        THE COURT:  Okay.  But is it enough just to say:  "And

20   if we have any non ERISA plans," if you actually haven't pled

21   that you have those?

22        Generally you see an alternative pleading.  Someone

23   says -- not in this context but in other contexts -- oh, it's a

24   breach of contract and in the alternative it's quantum meruit,

25   and that's an alternative pleading.  But if this is based on

1    some scenario, and we're not even sure we have the scenario, do

2    you have to be a little bit more specific in order to have

3    those go forward?

4              MR. BARBATSULY:  Certainly on the promissory estoppel

5    portion under the Broad Street case I think that is a viable

6    claim as an alternative even without knowing whether there's a

7    state law plan in play because --

8              THE COURT:  But if we're looking at the state law

9    claims as a block, how are they going forward if we don't have

10   the allegations that there are non ERISA claims?  That's really

11   the question.

12             MR. BARBATSULY:  Well, we do have allegations that to

13   the extent any of these 423 claims are not governed by an ERISA

14   plan, then by default they're going to be governed by state

15   law, and just given the shear number.  I think your Honor can

16   plausibly infer that the likelihood is that at least some are

17   state law governed claims.  But again we don't -- we're not

18   going to know that until we get the Plans.

19             So I don't want to belabor this because I don't know

20   that ultimately it makes a whole lot of difference.  But I do

21   think -- I come back to:  We think we've plausibly alleged the

22   existence of state law claims as -- you know, as an alternative

23   to -- you know, and to the extent that any of these 423 claims

24   are not governed by an ERISA plan.

25             THE COURT:  Okay.

 1              Counsel.

 2              MS. BJORKLUND:  Your Honor, a few points on that.  I

 3    point out, they do not allege the existence of a single non

 4    ERISA plan.  And they're vindicating rights on behalf of

 5    patients who receive ERISA plan disclosures every year.

 6              It appears that counsel has conceded that --

 7              THE COURT:  Do they need to, or is it just enough to

 8    say -- their exact language is:  To the extent that some of the

 9    Plans are not employee welfare benefit Plans governed by ERISA,

10    they are nonetheless valid and enforceable insurance contracts.

11              Is that enough?

12              MS. BJORKLUND:  I would say, your Honor, there must

13    be -- there are a number of missing allegations then.  If they

14    don't have access to the Plan, don't know whether it's ERISA or

15    not, obviously can't know anything about the terms of it.  They

16    can't plead a specific entitlement to state law relief based on

17    a breach of contract in that aspect.  I mean, I think that it's

18    one thing to say:  Here is a specific given set of facts and

19    there are alternate legal theories.  But what they're saying

20    is, there may be alternate facts and they just don't know.

21              It would be equivalent to saying:  So-and-so said X.

22    But to the extent so-and-so also said Y, we have another cause

23    of action, and that's certainly not legally sufficient.  So

24    that at this point the claims should not go forward.

25              I have heard counsel refer to the shear number of

1    claims, that that creates a burden for the parties and having

2    all these tangential issues that may actually not be applicable

3    to anything really does impose a burden and they should at

4    least be dismissed without prejudice for now.

5         We indicated a number of reasons, including for

6    alternate bases for dismissal.  But in any event, absent even

7    the allegation of any non ERISA plan, these should not be in

8    the case.

9         THE COURT:  Okay.

10        MR. BARBATSULY:  Just coming back.  These are not --

11   these are not alternative facts, these are -- we have evidence

12   that 423 claims were paid.  They were paid under some

13   obligation, at least ostensible obligation by United, and then

14   United is taking the position that these obligations no longer

15   exist and we demand a refund.  So that's not made out of whole

16   cloth.  There are 423 claims for which United is saying:  You

17   owe us money.

18        And so they're governed by -- you know, we believe

19   they're governed by ERISA plans.  But it's not for United who

20   has not even come forward with a single plan beyond what's been

21   pled in the Complaint, to say, well, you can't go forward now

22   because you don't have what we have.

23        And so we're saying that we've pled obligations and

24   they're either -- they're obligations under some plan, and the

25   plan is either -- the plans exist.  They exist, they're known

1     to United, and they are either ERISA plans or they're not ERISA

2     plans.  That's the only fact that is missing, is whether the

3     plans are not ERISA plans, and that's a fact that's uniquely

4     within United's possession.

5              So we think we've pled at this stage state law claims.

6     And if United wants to say, no, you haven't because we don't

7     have a single non ERISA plan, let them come forward with the

8     plans and then we'll revisit.

9              THE COURT:  Okay.

10             MR. BARBATSULY:  Thank you.

11             THE COURT:  Counsel.

12             MS. BJORKLUND:  Your Honor, I apologize for repeating

13    myself, but I continue to be surprised by the assertion that

14    these are uniquely in United's possession.  CarePoint is

15    vindicating the rights to the patient.  It has the same rights

16    to the patients and purportedly should have access to the same

17    documents that the patients already have.

18             I would say that the fact that they haven't gone

19    forward and collected those Plans and they cannot, they cannot

20    consistent with Rule 11 actually allege the existence of a non

21    ERISA plan, means that their case should be dismissed and they

22    shouldn't be excused from that basic pleading requirement.

23             THE COURT:  The other way to look at it is, he's

24    saying, look, I have the ERISA plans.  But to the extent any of

25    them actually are non ERISA plans, that's what we're pleading.

1          So in the absence of discovery should he be allowed to

2     go forward with that?  And then if nothing is actually produced

3     we probably need an amended pleading.

4          MR. BARBATSULY:  I think if nothing that's non ERISA

5     -- if a non ERISA Plan is produced, then I think you're right,

6     I think that would be an amended pleading subject to my one

7     qualification as to promissory estoppel under the Broad Street

8     case.  But, yes, your Honor.

9          MS. BJORKLUND:  Your Honor, I think allowing the

10    claims to continue in the case would be unnecessarily

11    burdensome where there is no basic allegation that can support

12    them.

13         I also point out that Plaintiffs' counsel articulated

14    pretty precisely what would constitute a non ERISA plan, and it

15    really is a fact-specific issue, governmental, that it didn't

16    have a policy of insurance and so on.  This isn't a situation

17    where we have a complex set of facts and it's unclear which

18    legal doctrine is going to apply.  That's pleading the

19    alternative legal theories.

20         This is a case where either the plan is ERISA or it's

21    not, and it's a very simple determination, kind of along the

22    lines of, is there a contract or not.

23         THE COURT:  How long would it take to get these

24    materials together?

25         MS. BJORKLUND:  Your Honor, I would have to consult

1    with my client.  I don't know.

2              THE COURT:  Okay.  We've had this case going on for a

3    while.  Has anyone looked at any of these Plans?

4              MS. BJORKLUND:  We have looked at some, yes.

5              THE COURT:  Okay.  And in looking at some, what were

6    they?  Were they ERISA or were they non ERISA?

7              MS. BJORKLUND:  The ones I've seen are ERISA.  But I

8    can't say I've seen all of them, 423.

9              THE COURT:  Okay.

10   Counsel.

11             MR. BARBATSULY:  We have only seen I think about ten,

12   so I'm not in a position to represent if they're all ERISA.

13   They were mostly ERISA.  Obviously the four that are in our

14   Complaint are ERISA, or we believe to be ERISA.

15             So I will say, as far as the burden though there's

16   really no burden because these are just legal theories premised

17   on a plan being governed by a different set of laws.  And so

18   the issue of the burden is really the claims themselves, the

19   423 claims.  So once we have the claims we're going to know

20   pretty quickly whether there are viable state law theories.

21   Once we have the plans, I should say, we'll look, we will know

22   whether we have viable state law claims or not.

23             So I don't think there's any burden on either of the

24   parties in allowing these claims, which we think are properly

25   pled, to go forward until we know for sure what the makeup of

 1    the Plans are.  I mean, we do know the Plans exist.  The case

 2    is going to go forward under these Plans and they're either

 3    covered by ERISA or they're covered by state law.

 4             MS. BJORKLUND:  Your Honor, If I can respond.

 5             I think we're talking about seven different claims and

 6    I think there is a difference between some of them.  So as to

 7    Count 4, which is breach of contract, I agree it's a similar

 8    analysis to an (a)(1)(B) claim for benefits.  But there are

 9    some state law claims that are very different and have

10    different elements and would require different discovery and

11    analysis and pleadings like Count 11, for example, which is

12    based on the New Jersey Consumer Fraud Act.

13             THE COURT:  Okay.

14             Let's go off the record for a moment.

15             (Off the record discussion.)

16             THE COURT:  Let's go back on the record.

17             I've just been conferring with counsel off record

18    regarding discussions of mediation.  Counsel are going to get

19    back to me by May 9th, one week's time, and speak to my staff

20    about their positions with respect to mediation.  And in

21    addition to that, I've talked to counsel about determining how

22    long it would take to compile the Plans at issue here.  And

23    they're going to go back to the clients and determine how long

24    that process will take.  And obviously we're grappling with the

25    issue of the non ERISA plans and the ERISA plans and trying to

1    figure out which ones we're actually dealing with here at this

2    point.  And both counsel have indicated they have clearly seen

3    the ERISA plan, so that is a concrete fact that has been

4    adopted by both the Plaintiff and the Defendant.

5          Correct?

6          MS. BJORKLUND:  Correct.

7          MR. BARBATSULY:  Correct, your Honor.

8          THE COURT:  So now we're just dealing with, are there

9    any actual non ERISA plans at issue; and how long it would take

10   to make that factual determination to present.

11         So once I hear from you we'll make a determination as

12   to how to move forward on this.  I'm going to hold on my

13   decision at this point in time to wait to hear from you folks

14   and then we'll figure out a way for moving forward.

15         With that, I ask counsel:  Do you have anything else

16   you would like to add, anything you would want to add or

17   clarify from the argument of today?

18         MS. BJORKLUND:  No, your Honor.

19         MR. BARBATSULY:  No, your Honor.  Thank you.

20         THE COURT:  Thank you.

21         Thank you very much for your presentation, for your

22   written presentation as well, it's been very, very helpful to

23   me.  I look forward to getting your update next week.  So

24   thanks very much.

25         MR. BARBATSULY:  Thank you, your Honor.

1            MS. BJORKLUND:   Thank you.

2            MR. JONES:   Thank you, your Honor.

3            THE DEPUTY CLERK:   All rise.

4            (Conclusion of proceedings.)

5                              ooOoo

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25